Filed 6/19/13  In re M.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.T. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  J.T. et al.,  Defendants and Appellants. | E057273  (Super.Ct.Nos. J235562 & J235563)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant J.T.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant E.T.

1

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

This is an appeal by defendants and appellants, J.T. (mother) and E.T. (father), from the trial court's order under Welfare and Institutions Code section 366.26 terminating their parental rights to their daughters, C. and M.[1]  Both parents contend the trial court erred in terminating their parental rights because the exception to parental rights termination set out in section 366.26, subdivision (c)(1)(B)(i), applies in this case. Mother and father also contend the trial court abused its discretion when it denied father's request to continue the section 366.26 hearing so that he could file a section 388 petition.

We conclude their claims are meritless.  Therefore, we will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are undisputed.  San Diego County Department of Health and Human Services filed section 300 petitions in August 2010 with regard to then five-year-old M. and seven-year-old C. after law enforcement officers conducted a welfare check after receiving a report that both girls and their father were asleep in a car in the parking lot of a gas station, and the car's engine was running.  The officers found mother passed out in the gas station bathroom.  According to the detention report, the family had been en route from San Diego to Redlands when they stopped in Encinitas so mother could stretch her legs and use the bathroom.  Mother said she had taken several prescribed medications, including OxyContin and oxycodone.  Father told the officers he had taken two Vicodin.

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The officers found 600 prescription pills, all prescribed to mother, in the trunk of the family's car, along with three pipes that contained marijuana residue. The interior of the car was littered with hundreds of cigarette butts, dirty laundry, spoiled food, and other trash. According to the detention report, the stench of rotten food, feces, and urine was "unbearable." Because mother and father appeared to be under the influence of controlled substances, law enforcement officers arrested them and took the two girls into protective custody.

One month earlier, San Bernardino County Children and Family Services (CFS) received a referral after M. was taken by ambulance to a hospital because mother and father thought she might have ingested some of mother's OxyContin. Hospital staff would not allow mother to leave with M. because mother was so heavily medicated she had difficulty keeping her eyes open. CFS could not complete an investigation on the referral because the social worker was unable to contact mother and father, apparently due to the fact that they did not have a permanent residence and were living in motel rooms.

The social worker also reported in the detention hearing report that mother suffered from various medical conditions, including Sjögren's Syndrome, which, according to the social worker, is a genetic condition that affects her tissue, joints, and endocrine system, and causes her pain for which she is prescribed oxycodone and OxyContin. A doctor confirmed mother's various medical issues, and also provided the social worker with a list of mother's prescribed medications.

San Diego County detained both girls and later found jurisdiction under section 300, subdivisions (b) and (g), as to both C. and M. Both girls were ordered placed in foster care. The court also ordered reunification services for mother and father and weekly monitored visits between mother and father and the children. In November 2010, San Bernardino County accepted transfer of the case.

According to the report prepared for the six-month review hearing in April 2011, a psycho-educational assessment disclosed that C. is autistic, mildly mentally retarded, and her verbal capacity was limited. M. had developmental delays both in gross and fine motor skills. She also had speech difficulties and poor writing skills, but she was reading at grade level. M. also had behavioral problems. The social worker described her as defiant and said she had tantrums four times a day, which lasted 15 to 30 minutes. M. would also wake up screaming and yelling in the middle of the night, but that behavior occurred less frequently when mother called and spoke with M. before bedtime. M. was diagnosed with intermittent explosive disorder and mental retardation, severity unspecified. Mother and father were participating in services and visitation. The court continued reunifications services, and ordered twice weekly supervised visits, which the court authorized the social worker to liberalize to unsupervised when appropriate.

For the 12-month review hearing in October 2011, the social worker reported that mother and father had made substantial progress on their reunification plan. Father had a job. The parents had a car and home. A doctor was monitoring their prescription medications. C. and M. had been moved to a new foster home (their sixth) at the request

of the most recent foster parents. Each of the previous homes had been unable to manage the girls' behaviors.

The trial court authorized six additional months of reunification services for mother and father, and set the 18-month review hearing date. The court also authorized the social worker to liberalize the frequency and duration of visitation, which could include unsupervised day and/or overnight visits as appropriate. The trial court also authorized the social worker to return the children to the parents on family maintenance, if appropriate.

The social worker recommended in the 18-month status review report that the children be returned to mother and father for a two-week trial/extended visit. Both parents were making progress on their reunification plans, although the social worker expressed concern about mother's ability to maintain a clean home, her cigarette smoking, and her anxiety level.

The parents' progress was torpedoed when drug test results for each of them were positive for PCP and methadone. Both parents denied taking either substance. When asked to specify her current medications, mother identified prescription medications that had not been included in the list her doctor had provided to the social worker. The social worker commented, "Although the parents deny taking any unauthorized substances, it does explain past events reported by the caregiver. According to the caregiver, the parents are frequently late, the children are returned smelling heavily of smoke and inappropriately dressed during rainy/cold weather, mother had appeared sweaty/groggy at times and has had to cut visits short due to being in pain. Mom has also been in a minor

5

car accident on the way to visit and was reportedly lost for hours. Overall, it appears as if the parents struggle with prescription medication and the children are at risk in their care." A week later, mother paid for a hair follicle drug test, the result of which was negative for both PCP and methadone.[2] In the interim, however, CFS relied on the positive drug test results to file a subsequent report in which it asked the court to terminate reunification services and set a section 366.26 hearing.

On March 8, 2012, the trial court continued the 18-month review hearing to May in order to obtain additional drug test results and for the social worker to evaluate the parents' home for an extended visit with the children over spring break. The social worker visited the parents' home on March 19, 2012. At a nonappearance review hearing on March 28, 2012, the social worker reported the parents' home was filthy, with dirt and caked grime on the floors and furniture. The hot water had been turned off for a week. There was only one twin bed in the room the children shared, and there was very little food in the refrigerator. When the social worker returned the next day, little had changed except that a dirty coffee table had been cleaned. Because of the condition of the home, the social worker decided against the parents having an extended visit with the children. Instead, until mother and father could demonstrate their home was safe, the social worker recommended unsupervised visits of no less than two hours at a location other than their home.

---

[2] Apparently, the parents sold their car to pay for mother's hair follicle drug test and did not have enough money to have father tested.

After mother and father both tested positive for opiates in April, the social worker submitted an addendum report again asking the trial court to terminate family reunification services and set a section 366.26 hearing. At the conclusion of the contested 18-month review hearing on May 23, 2012, the trial court followed the social worker's recommendation and set the section 366.26 hearing.

By the time of the selection and implementation hearing on October 3, 2012, M. and C. had been in their foster placement for over a year, and their foster parents wanted to adopt both girls. Father made a motion to continue the hearing so that he could file a section 388 petition. Mother joined in that motion, the details of which we recount below. The trial court denied the continuance motion. With respect to the permanent plan for C. and M., mother and father asserted that the beneficial parental relationship exception applied and, therefore, the trial court should not terminate their parental rights. Instead, mother and father urged the court to select guardianship as the permanent plan for both C. and M. The trial court declined the parents' request and, instead, terminated their parental rights after making the required findings.

Mother and father appeal from that order.

## DISCUSSION

## 1.

## BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

Once the court terminates reunification services, the focus of juvenile dependency proceedings is on the needs of the child, and specifically on the need for a stable, permanent home. Therefore, adoption is the statutorily preferred permanent plan for a

dependent child. If the court finds that the child is adoptable and is reasonably likely to be adopted, the court must terminate parental rights and order the child placed for adoption unless the court finds that one of the exceptions set out in section 366.26, subdivision (c), applies. (§ 366.26, subd. (c); *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Under section 366.26, subdivision (c)(1)(B), the court may decline to terminate parental rights, even if it finds the child is adoptable and there is a reasonable likelihood that the child will be adopted, if the court finds one of several statutorily specified "compelling reason[s] for determining that termination would be detrimental to the child." The statutorily specified compelling reason, or exception, at issue here is that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.36, subd. (c)(1)(B)(i).)

The parents have the burden of demonstrating that the so-called beneficial parental relationship exception applies. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) In order to meet that burden, the parents must demonstrate both that they have maintained regular visitation and contact with the child and that a continued parent-child relationship would "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. . . . If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; see also *In re S.B.* (2008) 164 Cal.App.4th 289, 297.) "[T]he parent must show more than frequent and loving contact, an emotional

8

bond with the child, or pleasant visits. . . . [T]he parent must prove he or she occupies a parental role in the child's life . . . . [Citations.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)

## A. Standard of Review

"Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination. Thus . . . a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental or sibling relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

"The same is not true as to the other component of these adoption exceptions. The other component of both the parental relationship exception and the sibling relationship exception is the requirement that the juvenile court find that the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.' (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is *based* on the facts but is not primarily a factual issue. It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have

9

on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

## B. Analysis

With respect to the first requirement, which requires mother and father to show they maintained regular visitation and contact, mother and father presented substantial evidence to support a finding in their favor on that requirement. Mother and father maintained regular weekly contact with C. and M. At one point, before they had their own car, mother and father spent four hours, twice a week on a bus in order to visit with the children. Although mother acknowledged in her testimony at the selection and implementation hearing that she had missed three visits since the trial court terminated reunification, her visitation and contact with C. and M. nevertheless was regular. The social worker stated as much in her report for the section 366.26 hearing—"Throughout the life of this case, the children have had weekly contact with their parents through supervised visits, including unsupervised and overnights at one time. During this reporting period, [father] has been unable to attend several visits due to his work schedule, but attends when he can. The paternal grandmother who resides with the parents has attended one or two visits during the reporting period as well. During the visits, the mother usually brings an arts and crafts project to work on, such as jewelry making, drawing, or clay."

The trial court, in adopting county counsel's assertion that the parents had not maintained regular contact and, therefore, had not met the first requirement of the exception, apparently interpreted the phrase to require proof that the parents had never missed a visit. The statute does not require a perfect record of visitation; it requires regular visitation and contact. Mother and father met their burden of presenting evidence to demonstrate they had regularly visited and maintained contact with C. and M. during the course of the dependency.

The second factor, the existence of a beneficial relationship, requires evidence regarding "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' [Citation.] '[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' [Citation.]" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937-938.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; see also *In re S.B.*, *supra*, 164 Cal.App.4th at p. 297.)

Although a close case, we cannot say the evidence in this case compels a finding in favor of mother and father. C. was seven years old and M. was five when they were removed from the custody of mother and father. At the time of the selection and

11

implementation hearing, the girls were eight and five years old, respectively. They had been in five different foster placements before being placed with their prospective adoptive family in July 2011. As a result, mother and father were the only parental figures in the girls' lives for all but one year. The social worker and foster mother both confirmed that C. and M. were bonded with their parents. Moreover, mother and father had unsupervised overnight visits with the girls over the course of the dependency. During those unsupervised visits, mother and father necessarily performed their duties as parents to the girls. The social worker effectively said as much when she reported that C. and M. were in good condition when returned to foster care, and there were no reports of inappropriate behavior.

As previously noted, C. and M. both have special needs. Because mother suspected C. was autistic, she had requested an individual education program (IEP) for the child when C. entered kindergarten. Mother and father both participated in C.'s IEP and cooperated in having C. evaluated for Inland Regional Center services. As noted above, M. was diagnosed with intermittent explosive disorder and mental retardation of unspecified severity. During the course of the dependency process, M. was also diagnosed with attention deficit hyperactive disorder.

Mother and father presented evidence to show that C. and M. were bonded with their parents. Both girls related to their mother and father as parents. Apart from the circumstances leading to the dependency, mother and father engaged in appropriate interaction with both girls. Mother testified at the selection and implementation hearing that at the start of their visits, both girls would run and jump into her arms, and then they

would spend the visit sitting on mother's lap in order to be as close to her as possible. Mother brought pictures the girls had drawn to the hearing, which she said reflected their feelings about their parents and their sadness over the possibility that they would not see each other again. In one of the pictures, M. drew a heart and explained to mother that her heart was broken because she was not with mommy and daddy.

The social worker testified that the girls were bonded with their parents and the caregivers equally. The social worker acknowledged, however, given the strength of the relationship between the children and their parents, that to a "certain extent" it would benefit the children to continue the relationship, "[a]nd that is why I have been pressing the caregivers to maintain a relationship with the birth parents." The social worker also acknowledged that her predecessor had discussed and considered guardianship, "but she felt adoption was in the best interest of the children and provided them permanency." When asked whether all the things she had just mentioned could be provided to the children under a guardianship, the social worker did not disagree, and said, "Possibly."

In arguing that the evidence supports the court's finding in this case, county counsel cites only the circumstances that led to termination of reunification services. Those circumstances are not in dispute, and they are not relevant to the question of whether the children had a substantial, positive emotional attachment such that they would benefit from continuing their relationship with mother and father. After the witnesses had testified, the court asked the social worker to bring the children to court so that their attorney could make it clear to them, to the extent possible, that they would not see their parents again if the court ordered adoption as the permanent plan. After talking

13

with M., the more "verbal child," the attorney for the children reported that M. said, "'I have a happy life where I am with the family I'm with right now, and that's where I want to stay. And I like it there.'" When asked how she would feel if she could not see her mother or father again, M. said, "'Sometimes sad, but not all the time.'" M. also reportedly said that she wanted to be adopted.

The above noted evidence is sufficient to establish the existence of a beneficial relationship between the children and their parents. Therefore, the remaining issue we must address is whether it was an abuse of the trial court's discretion to find that the benefit the children derived from their relationships with mother and father was not a "*compelling reason* for determining that termination would be detrimental." (§ 366.26, subd. (c)(1)(B), italics added.) In other words, we must determine whether the court abused its discretion when it determined the importance of the relationship, in terms of the detrimental impact its severance would be expected to have on C. and M., was outweighed by the benefit to C. and M. of adoption.

Although a very close case, we cannot say the court abused its discretion in this case when it determined that the benefit of adoption outweighed the detrimental impact on C. and M. of severing their relationship with mother and father. M.'s statement, quoted above, that she would sometimes feel sad, but not all the time, if she could not see her parents, best states the impact of severing her relationship with mother and father. We do not minimize the emotional impact on both the children and the parents of ending a significant relationship and emotional bond. But we cannot say that either C. or M. would be greatly harmed by severing the relationship. Therefore, the court did not abuse

14

its discretion in this case, when the benefit of continuing that relationship is weighed against the benefit of a permanent adoptive family.

**2.**

**DENIAL OF MOTION TO CONTINUE SECTION 366.26 HEARING**

Father and mother contend the trial court abused its discretion when it denied father's motion to continue the section 366.26 hearing. Father's attorney made that motion at the start of the selection and implementation hearing, on the ground that father and mother were, that day, moving into "a new stable residence," an event that arguably constituted a change of circumstance. Father asked his attorney to file a section 388 motion. To that end, father's attorney asked the trial court to continue the contested section 366.26 hearing so that he could gather the necessary documents from father and file the requested motion.

As father acknowledges, a continuance will only be granted upon a showing of good cause. (§ 352, subd. (a).) He and mother both contend the need to file a section 388 petition is good cause that warrants a continuance of the section 366.26 hearing. We disagree.

As discussed previously, once the court terminates reunification services, the needs of the children for permanence and stability are the focus of the dependency. The ability of the parents to reunify with the children is no longer a primary concern. Moreover, the issues that ultimately prompted the court to terminate reunification services in this case were the excessive use of prescribed medications and the condition of the parents' home, not the absence of a home. Thus, the fact that mother and father

15

were about to move into a new home really was not a change in circumstance that would warrant modification of the order setting the selection and implementation hearing.

Accordingly, we conclude the trial court did not abuse its discretion in denying the parents' continuance request because they failed to establish good cause to support a continuance.

## DISPOSITION

The order terminating the parental rights of mother and father as to C. and M. is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

16